Filed 10/22/21  P. v. Frenes CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | E072198 |
| v. | (Super. Ct. Nos. BAF1701308 & BAF1700147) |
| MARTIN EZEQULE FRENES, | OPINION |
|     Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Thomas E. Kelly, Judge.*
Affirmed with directions.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

* (Retired judge of the Santa Cruz Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

1

INTRODUCTION

Defendant and appellant, Martin Frenes appeals from the judgment entered following jury convictions for first degree murder (Pen. Code, § 187, subd. (a)[1]; count 1) and robbery (§ 211; count 2). The jury also found true as to count 1 that defendant personally and intentionally discharged a firearm and proximately caused great bodily injury and death (§ 12022.53, subd. (d)). The jury also found true as to count 1 the special circumstances of intentionally killing a witness to prevent his testimony in a criminal proceeding (§ 190.2, subd. (a)(10)), and intentionally killing the victim in furtherance of the defendant's criminal street gang (§ 190.2, subd. (a)(22); § 667.5, subd. (a)(22)). As to count 2, the jury found true that defendant personally used a firearm (§ 12022.53, subd. (b)). In a bifurcated proceeding, the trial court found true that defendant had a prison prior and a strike prior (§§ 667, 667.5, subd. (b)). The trial court sentenced defendant to a determinate prison term of 26 years for robbery, and a consecutive indeterminate term of life without the possibility of parole for murder.

Defendant argues the following on appeal: (1) The trial court erred in denying his motion to sever trial of the robbery and murder counts; (2) the court erred in denying his request for an in camera hearing on his motion to sever; (3) the court erred in instructing that the jury could consider an eyewitness's level of certainty when making an identification; (4) the court erred in admitting evidence of a jail "kite"; (5) the court failed

---

[1] Unless otherwise noted, all statutory references are to the Penal Code.

to give sua sponte CALCRIM No. 418 on the conspiracy hearsay exception; (6) the trial court failed to instruct on the elements of defendant's gang's predicate crimes, required for finding true the gang special circumstance (§ 190.2, subd. (a)(22)); (7) there was insufficient evidence of the gang special circumstance; (8) there was insufficient evidence of the witness-killing special circumstance; (9) the abstract of judgment incorrectly states defendant's convictions were by a court trial, rather than a jury trial; and (10) his prison prior should be stricken under Senate Bill No. 136 (2019-2020 Reg. Sess.) (Stats. 2019, ch. 590, § 1).

We agree with the parties that section 667.5, subdivision (b), as amended by Senate Bill No. 136, requires defendant's one-year prison prior stricken and this matter be remanded for resentencing. We also direct the trial court to correct the abstract of judgment because it incorrectly states that defendant's convictions were by a court trial, rather than a jury trial. In all other regards, the judgment is affirmed.

## II.

## FACTS

### A. *Robbery*

On January 20, 2017, at 7:50 a.m., defendant stopped at a gas station to get gas. He was driving a silver sedan. A.E. also arrived at the gas station, and entered the gas station store at the same time as defendant. Defendant attempted to pay for gas with a $100 bill. The clerk ran the bill through the counterfeit detector machine, which rejected the bill as counterfeit.

3

Defendant asked the next person in line, A.E., if he would exchange his $100 bill for cash. A.E. had $1,995 in cash, which he intended to pay for auto repairs. A.E. removed some cash from his wallet and gave it to defendant in exchange for the $100 bill. After paying for his gas, A.E. left to put gas in his truck. Defendant then paid for his gas. The clerk noticed defendant had a tattoo on his chin depicting the Mayan symbol for the number 13, consisting of two bars and three dots.

As A.E. drove home from the gas station, surveillance video showed defendant may have followed A.E. home. Surveillance video from a nearby business showed a truck drive past that may have been A.E.'s truck, and then a car drive past in the same direction a few seconds later that may have been defendant's car. About five minutes after leaving the gas station, A.E. arrived home. As he was about to enter his home, A.E. was surprised to see defendant arrive. Defendant pulled out a gun from his sweatshirt, pulled the slide to chamber a bullet, pointed the gun at A.E., and said, "'Give me your wallet.'" Fearing for his life, A.E. complied. Without saying anything else, defendant took the wallet and drove away. A.E. called the police. A.E. identified defendant as the robber in a photographic lineup and in court.

B. *Murder*

Albert Ramirez was charged with committing murder and attempted murder of John Moreno in April 2015. Albert and Ricardo Ramirez, who were members of the Hemet criminal street gang, Southside Criminals (SSC), were also charged with dissuading a witness in April 2015. In May 2015, Police Investigator Purcell, who was

4

investigating the murder, interviewed Jesus Garcia, who was a member of the Perris Maravilla gang (PMV). Jesus told Investigator Purcell that, on the night of the murder, Albert and Ricardo drove to his house and, while Ricardo remained in the car, Albert tried to hand Jesus a sawed-off rifle.[2] Albert asked Jesus to hold the gun and told Jesus, "'I want you to hold on to this." "'Hold on to this for me. It's really hot right now.'" Jesus explained to Investigator Purcell that the words, "'really hot right now,'" meant the gun had just been used to shoot someone. Jesus thus inferred from Albert's words that Albert had shot someone with the gun. Jesus refused to take the gun but accepted a spent casing Albert ejected from the rifle and handed to him. Jesus tossed the casing over his fence. Investigator Purcell later retrieved the casing. In October 2016, during the preliminary hearing on the charges against Albert and Ricard, Investigator Purcell testified to what Jesus had told him.

On January 23, 2017, close to midnight, H.G. awoke to the sound of a gunshot. Within seconds, there was a second gunshot. H.G. looked out the window that faced a house at 800 Felipe Place owned by C.B. E.C. lived in a converted garage on C.B.'s property. E.C. was a close friend of defendant's. Defendant sometimes visited E.C. there. Jesus was also a friend of E.C.'s and also occasionally visited E.C.

---

[2] Investigator Purcell initially testified Ricardo asked Jesus to hold the gun and told Jesus, "'I want you to hold on to this,'" "'Hold on to this for me. It's really hot right now.'" Investigator Purcell then stated that Albert, rather than Ricardo, was the one who told Jesus to hold the gun and spoke to Jesus about the gun. Ricardo remained in the car. The testimony that Albert, not Ricardo approached Jesus is consistent with Investigator Purcell's preliminary hearing testimony.

When H.G., a neighbor, looked out the window, he saw a man wearing jeans and a black sweatshirt with the hood over his head. The man ran from the property where E.C. lived, jumped into a Corolla, and drove away with his headlights turned off. H.G. called 911. Investigator Gomez testified he arrived at H.G.'s home within seven minutes of a call reporting shots fired.

After speaking with H.G., Investigator Gomez contacted C.B. at his residence. M.N., who lived with C.B., was also present. Investigator Gomez and other officers conducted a safety sweep of the area, including C.B.'s residence and garage, to make sure the residents were safe, because C.B.'s neighbor, H.G., told him it sounded like the shots had come from that area. H.G. had also reported he saw someone in the area after hearing the shots and saw a white Toyota leaving the area. No evidence of a crime was found in C.B.'s home at that time. Investigator Gomez saw keys in the driveway but there was no probable cause to seize them. M.N. said she had not seen the keys before.

C.B. testified that defendant, who was known as "Temper," was E.C.'s boyfriend. Defendant frequently visited E.C. at her residence on C.B.'s property. C.B. heard three gunshots in close sequence emanating from the cross street near his residence. C.B. testified he told Detective Hall, who interviewed him, that after he heard the shots, he heard E.C. say, "Oh, Martin," and saw E.C. talking on the phone as she rushed out of her house. E.C. returned later that night. C.B. saw her leave again that night, with her purse. He did not see her take anything else, although he noticed her DVR player in the garage was gone. C.B. did not see her again for a couple of weeks.

6

M.N. testified she also heard three gunshots while in the kitchen and yelled out to E.C., "'Are you okay?'" After the shots, M.N. saw E.C. and, E.C.'s friend, "Dopey," ride bicycles out to the street.

J.C. testified that his stepson, D.R., and defendant were good friends. They were from the same gang, SSC. D.R. was killed in November 2016. J.C. further testified that, on January 24, 2017, around 12:30 a.m., defendant arrived at J.C.'s house, driving a Toyota, which was an older, "little white car." Defendant asked to shower and then said to J.C., "'I got to tell you something.'" Defendant said he had just shot "some fool from Perris." He did not say who he shot. Defendant said he had "paperwork" on the person and that the victim was a police informant. Defendant told J.C. he was going to leave town but did not say why.

J.C. testified that after defendant told him he had shot someone, defendant handed J.C. an unloaded gun. Defendant did not tell him what to do with the gun. J.C. put the gun in his truck. The gun had an ammunition clip inserted in it. While at J.C.'s house, defendant kept looking out the window to see if anyone was coming. J.C. described him as "paranoid." When J.C. asked defendant, "'What are you doing, or what happened?,'" defendant did not say anything. Defendant did not say or do anything else while at J.C.'s home. Defendant left at 4:30 or 5:00 a.m., in his small white car.

After defendant left, J.C. texted C.R., J.C.'s estranged wife, to let her know defendant had just left J.C.'s house and would be gone for a while. J.C. told her this

7

because defendant had said he was leaving town because he "got into something" and had shot someone.

R.G. testified that at 5:00 or 6:00 a.m., E.C. arrived at his home on January 24, 2017, and slept at his house for a few hours. Defendant arrived later that day, looking for her. He appeared to be in a hurry. Defendant asked R.G. what E.C. had told him.

At 7:30 a.m., on January 24, 2017, Police Detective Young noticed a black Cadillac with its windows down, parked in front of a residence about a mile from the residence of J.P., who lived a few houses down the street from C.B. Detective Young conducted a license plate check, which showed Jesus was the registered owner. Fifteen minutes later, Young responded to a call from J.P., reporting he found a body (Jesus's) and showed Young the body. A wallet recovered from Jesus's body contained identification for Jesus. J.P. told Young that he had heard arguing and then two gunshots around midnight. He thought the arguing and gunshots came from the corner of Felipe Place and Wright Street, where C.B.'s home was located.

On January 25, 2017, defendant was arrested for an unrelated crime of receipt of stolen property, and was thereafter incarcerated for the robbery on January 20, 2017. While in jail on January 25, 2017, defendant had a recorded telephone conversation with his mother. Defendant said to her, "I need to get f---ing bailed out, like ASAP." "I just need you to hit up my people so that way I could get the f--- out of here. Like straight out and never come back again, for reals." When his mother asked what was going on, defendant told her to "read between the lines" and that "it's something serious."

8

"[W]orst case scenario, I'll just be in here for the rest of my f---ing life." "I f---ing need to get the f--- out of here like straight up. . . . I'm gonna be gone. I'm talking gone out of the f---ing country gone." In response to his mother asking what he did, defendant said: "I f---ing gave somebody a kiss in the face." A gang expert testified this statement may have been a reference in gang parlance to defendant shooting Jesus in the face below the ear. Defendant also told his mother that she should contact J.C. and his wife.

While in jail on February 2, 2017, defendant called J.C. and said he needed $500 for bail. Defendant asked J.C. during the recorded telephone conversation, "you still got that thing?" J.C. said he did, referring to the gun defendant previously handed him. Defendant told J.C. to "try to sell that thing . . . to somebody within the circle," referring to selling the gun to one of defendant's friends.

That same day, on February 2, 2017, J.P. told Investigator Alvarez that, after hearing the gunshots from the corner of Felipe Place and Wright Street, he heard a loud bang on the side of his house. He pointed to a damaged storm drain that might have been struck. Investigator Alvarez looked around outside J.P.'s house and found a spent .380-caliber casing on the side of the house.

The next day, defendant again called J.C. and again asked if he "still got the thing." J.C. said he did and that it was "put away." Defendant told J.C. "I need to f---ing sell it to get bail." Defendant repeated that he needed J.C. to "get rid of it" so defendant could "get bailed out." J.C. sold the gun for $450 to his brother-in-law's friend. Instead of using the money for defendant's bail, J.C. used the money to pay for his own ticket.

9

On February 10, 2017, the police told J.C. they were looking for a handgun used in a murder. After J.C. said he did not know anything, he was arrested for gun and marijuana possession and child endangerment. After spending the night in jail, the next morning J.C. told the police he could get the gun. The police released J.C. to retrieve the gun, which he did that same day. J.C. provided the .380-caliber gun to Police Detective Hall and later pleaded guilty to being an accessory to Jesus's murder.

Forensic evidence suggested Jesus was shot outside E.C.'s home and he managed to get to J.P.'s backyard, a few houses down the street, where his body was found. Investigators also found blood drops leading into J.P.'s backyard, and a .380-caliber spent casing in front of C.B.'s residence. Jesus had entry gunshot wounds to the right side of his face, and to the right and left sides of his back. He also had exit wounds to the right and left sides of his chest. A bullet was removed from Jesus's left shoulder.

The crime laboratory for ballistics analysis received the recovered .380-caliber handgun, the spent bullet recovered from Jesus's autopsy, and two shell casings. The grooves and marks on the bullet and shell casings indicated the bullet and shell casings were discharged from the handgun defendant handed to J.C.

During the trial, the prosecution introduced evidence that in 2011, law enforcement had documented defendant as a potential member of the "Hemet Trece" street gang and the SSC gang. His moniker was "Temper" and he had gang-related tatoos and wore gang-related clothing. He also was observed in the SSC gang's neighborhood and associating with SSC member, Ricardo. Defendant was found in possession of a

10

notebook that stated the words, "Temper," "Hemet 13," and other gang writing. Defendant had a chin tattoo of the Mayan symbol for the number 13, which is associated with the Sureños jail group.

A correctional officer testified that on September 18, 2018, he found a "kite" during a search of a jail cell. The correctional officer testified that a kite is a small, concealed piece of paper used as a message secretly passed to another inmate. It is used by inmates as a method of communicating with each other surreptitiously. The confiscated kite was found in the cell of an inmate who was in charge of a group of inmates known as Sureños. The kite stated defendant was a Sureños member, his moniker was "Temper," and his next court appearance date was in September.

Defendant's mother, sister, and girlfriend testified on his behalf. Defendant's mother testified that defendant had been friends with E.C. for about 10 years. E.C. lived a couple of streets away from defendant's mother's house. Defendant's sister stated that E.C. was not defendant's girlfriend. She was a friend. Defendant's girlfriend, C.F., testified that she had known defendant for four years. She stated she had been with defendant most of the time, from the middle of January 2017, until she and defendant were arrested on January 25, 2017. They were found sleeping in a green Honda, which they had been driving around in for a couple of days.

11

## III.

## MOTION TO SEVER TRIAL

Defendant contends the trial court erred in denying his motion to sever trial of the robbery charges from trial of the murder charges. We disagree.

A. *Procedural Background*

The People filed separate felony complaints against defendant for robbery of A.E. on January 20, 2017, and for the murder of Jesus on January 23, 2017. After the trial court conducted separate preliminary hearings on the charges, the People filed separate informations. On November 1, 2018, four weeks before defendant's trial began on November 27, 2018, the prosecution moved to consolidate the two cases because the cases involved crimes committed within three days of each other, and the gang and gun evidence was cross-admissible.

Anticipating the court would consolidate the cases, defendant requested severance of the cases, if joined (motion to sever), on grounds of gross unfairness and undue prejudice. Defendant argued he would be prejudiced by joining the "strong" robbery case with the weak murder case. Defendant also argued the jury in the robbery case would be inflamed by evidence of the gang charges in the murder case.

On November 27, 2018, the court heard and took under submission the motions to consolidate and sever. Two days later, the court adopted its tentative ruling granting the People's motion to consolidate the robbery and murder cases, and denying defendant's

12

motion to sever.[3] The court explained that consolidation was proper because the robbery and murder were the same class of crime. They were both assaultive crimes with firearms. Therefore, defendant had the burden of showing consolidation presented a substantial danger of undue prejudice.

The court found defendant had not established sufficient prejudice for severance. The court noted a finding of cross-admissibility of evidence was no longer required under section 954.1. However, the court found there was cross-admissibility of evidence, which dispelled any issue of prejudice. The court stated that gang evidence was cross-admissible, and the robbery and murder, which were committed within a few days of each other, may have been committed with the same gun. The court further concluded that a weak case was not being joined with a strong case. The court believed both cases were strong. In addition, the court stated that both the robbery and murder offenses had inflammatory elements. The trial court noted the preference was for joint trials, and defendant had not made a clear showing of a danger of undue prejudice, required for severance.

---

[3] It appears the two minute orders dated November 29, 3018, incorrectly indicate that both the motion to consolidate and motion to sever were denied, whereas the reporter's transcript states the motion to consolidate was granted and the motion to sever was denied.

B.  *Applicable Law*

Section 954 states regarding consolidation and severance that "[a]n accusatory pleading may charge . . . *two or more different offenses of the same class of crimes or offenses*, under separate counts, and *if two or more accusatory pleadings are filed in such cases* in the same court, *the court may order them to be consolidated. . . .*  [T]he defendant may be convicted of any number of the offenses charged . . . ; provided, that *the court* in which a case is triable, *in the interests of justice and for good cause shown*, *may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately . . . .*"  (Italics added.)

Under section 954.1, "[i]n cases in which two or more different offenses of the same class of crimes or offenses have been charged together in the same accusatory pleading, or where two or more accusatory pleadings charging offenses of the same class of crimes or offenses have been consolidated, *evidence concerning one offense or offenses need not be admissible as to the other offense or offenses* before the jointly charged offenses may be tried together before the same trier of fact."  (Italics added.)

The California Supreme Court has construed the words, "'same class of crimes or offenses,'" within the meaning of section 954 as "'"offenses possessing common characteristics or attributes."'"  (*People v. Kemp*, *supra*, 55 Cal.2d at p. 476.)  Robbery and murder are offenses of the "same class of crimes or offenses," because both are assaultive crimes against the person, with many attributes in common.  As such, the offenses were joinable under section 954.  (§ 954; see also *People v. Miller* (1990) 50

14

Cal.3d 954, 986-987; *People v. Thomas* (1990) 219 Cal.App.3d 134, 140.)  Where it is undisputed that the statutory requirements for joinder are met, the defendant can predicate error only on a clear showing of prejudice.  (*People v. Thomas*, *supra*, at pp. 140-141.)

The determination of prejudice is dependent on the particular circumstances of each individual case.  (*People v. Memro* (1995) 11 Cal.4th 786, 850 (*Memro*).)  Criteria supporting severing charges qualifying for consolidation, based on prejudice include:  (1) evidence of the crimes to be jointly tried would not be cross-admissible; (2) among the consolidated charges are charges that are unusually likely to inflame the jury against the defendant; (3) "a 'weak' case has been joined with a 'strong' case, or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges."  (*People v. Sandoval* (1992) 4 Cal.4th 155, 172-173, affirmed in *Victor v. Nebraska* (1994) 511 U.S. 1; see also *Memro*, *supra*, at p. 850; *People v. Thomas* (2012) 53 Cal.4th 771, 799-800.)

"The criteria listed in *Sandoval* should not be misunderstood as being equally significant, however.  '[T]he first step in assessing whether a combined trial [would have been] prejudicial is to determine whether evidence on each of the joined charges would have been admissible, under Evidence Code section 1101, in separate trials on the others. If so, any inference of prejudice is dispelled.'"  (*Memro*, *supra*, 11 Cal.4th at p. 850; see also *People v. Armstrong* (2016) 1 Cal.5th 432, 456 [existence of cross-admissible evidence "'alone is normally sufficient to dispel any suggestion of prejudice and to

justify a trial court's refusal to sever properly joined charges'"].)  "Cross-admissibility suffices to negate prejudice, but it is not needed for that purpose.  Although '"we have held that cross-admissibility ordinarily dispels any inference of prejudice, we have never held that the absence of cross-admissibility, by itself, sufficed to demonstrate prejudice."'  (*Memro*, *supra*, at p. 850, quoting *People v. Sandoval*, *supra*, 4 Cal.4th at p. 173; see also § 954.1, enacted June 5, 1990 [codifying rule that cross-admissibility is not required for consolidation]; *People v. Miller*, *supra*, 50 Cal.3d at p. 987; *People v. Cunningham* (2001) 25 Cal.4th 926, 985.)

This court must consider "the record before the trial court when it made its ruling."  (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220.)  We review the trial court's ruling granting consolidation and denying severance based on the abuse of discretion standard of review.  (*Memro*, *supra*, 11 Cal.4th at p. 850.)

C.  *Denial of Severance Was Proper*

It is undisputed the statutory requirements for joinder of the robbery and murder cases were met in this case.  The robbery and murder offenses are of "the same class of crime" within the meaning of section 954, because they possess common characteristics or attributes.  (*People v. Kemp* (1961) 55 Cal.2d 458, 476.)  They are both assaultive crimes involving firearms.  Because consolidation of the robbery and murder cases was proper under section 954, defendant can predicate error only on a clear showing of substantial danger of undue prejudice.  (*People v. Thomas*, *supra*, 219 Cal.App.3d at pp. 140-141.)

16

Defendant has not demonstrated prejudice sufficient to mandate severance of the properly joined robbery and murder charges. The prosecution demonstrated that there was material cross-admissible evidence. Such evidence included gang evidence in both cases, and gun evidence that both crimes may have been committed by the same gun. In addition, the trial court reasonably concluded defendant had not met his burden of showing prejudice based on joining a strong case with a week case. The trial court concluded that both the robbery case and murder case were strong cases, such that there would not be a prejudicial "spillover" effect on either case. During the hearing on consolidation and severance, defendant conceded the robbery case was a strong case. Defendant argues, however, that the murder case was a weak case because there was no evidence of anyone observing defendant at the scene of the murder or witnessing defendant shoot Jesus. We conclude the trial court reasonably concluded there was no significant risk of an unjustified conviction based on the spillover effect. The facts presented in the parties' written motions and opposition, and oral argument during the hearings on the motions were sufficient to support the trial court's determination that the murder case against defendant was strong, as was the robbery case. Defendant acknowledged in his factual summary in opposition to consolidation that "the main evidence against the Defendant is that the Defendant gave a witness a gun to hide that was later recovered and matched the shell casings found at the scene. The witness [J.C.] claims the Defendant admitted the shooting to him and that the Defendant murdered Mr. [Jesus] because he was a snitch." We thus reject defendant's contention the murder case

17

was weak. There was strong evidence implicating him in Jesus's murder, as well as in the robbery.

In addition, it was unlikely the evidence in one of defendant's cases would inflame the jury against him in his other case. The robbery case included gang evidence and evidence that defendant robbed a good Samaritan who kindly gave him change. The murder case involved a gang-related killing of a police informant. The trial court reasonably concluded that any inflammatory evidence in either of the cases was not significantly disparate, and therefore severance was not required. (*Memro*, *supra*, 11 Cal.4th at p. 851.)

In denying severance, the trial court correctly noted the preference is for joint trials. (*Alcala v. Superior Court*, *supra*, 43 Cal.4th at p. 1220 ["because consolidation or joinder of charged offenses ordinarily promotes efficiency, that is the course of action preferred by the law"].) Here, consolidation and denial of severance was not an abuse of discretion because defendant did not meet his burden of making a clear showing of potential prejudice or demonstrate that denying severance would result in gross unfairness.

D. *Denial of an In Camera Hearing on Defendant's Severance Motion*

Defendant contends the trial court abused its discretion by denying his request for an in camera hearing on his motion for severance of the robbery and murder charges. In his motion to sever, defendant requested the trial court to hear his motion in camera, out of the presence of the prosecution, to avoid disclosing to the prosecution attorney work

18

product and his defense strategy, which included whether defendant would testify and, if so, the anticipated content of his testimony and reasons he should not testify in both cases.

After the court granted consolidation and denied severance of the robbery and murder cases, the court explained that defendant's request for an in camera review of his motion to sever was denied because, under *People v. Montes* (2014) 58 Cal.4th 809, 833 (*Montes*), an in camera hearing was discretionary and not required. The trial court concluded the prosecution had a right to have counsel present during the hearing, and excluding the prosecutor would be extremely prejudicial. The court added that the "defense did not vigorously press for an in camera hearing." In addition, the court concluded it was not likely defendant would testify in one case and not in the other. The court noted that defendant needed to testify to explain his recorded jail phone conversations in the murder case. He also had an incentive to testify in the robbery case as to his robbery alibi, to explain his whereabouts. The trial court thus reasonably denied severance, concluding that defendant had an equal incentive to testify in both the murder and robbery cases.

Defendant argues that the trial court failed to take into account the specific circumstances of the case which supported an in camera hearing. Defendant asserts that the trial court was aware he wanted to testify at all on one count but not on the other. Therefore he would not have been able to testify if the robbery and murder cases were consolidated. Citing *People v. Thomas*, *supra*, 53 Cal.4th at page 800, defendant argues

19

that under such circumstances, the robbery and murder cases should not have been consolidated.

In *Thomas*, *supra*, 53 Cal.4th 771 the court stated that "severance is not required on such grounds unless the defendant makes a showing that ""he has both important testimony to give concerning one count and [a] strong need to refrain from testifying on the other."" [Citations.] The showing must be specific enough to permit the court to 'weigh the considerations of economy and expedient judicial administration against the defendant's interest in having a free choice with respect to testifying.' [Citation.]" (*Id.* at p. 800.) In *People v. Sandoval*, *supra*, 4 Cal.4th at page 173, the court held that the defendant's showing required for a severance was insufficient "because he merely made a 'passing reference' to the circumstance that he wanted to testify in one case and not the other, and did not explain the nature of the testimony he wanted to give in the one case or his reasons for not wanting to testify in the other."

Here, defense counsel merely indicated that defendant might wish to testify in one case but not the other. He made no offer of proof as to what the testimony might be or why he did not wish to testify in the other case. Defendant merely requested an in camera hearing without providing any specific information as to why it was necessary in weighing the considerations favoring joinder against defendant's interest in having a free choice with respect to testifying. (*People v. Sandoval*, *supra*, 4 Cal.4th at p. 174; *People v. Thomas*, *supra*, 53 Cal.4th at p. 800.) Defendant argues the trial court prevented him from providing specific information as to why severance was necessary by denying his

request for an in camera hearing. Defendant did not sufficiently demonstrate an in camera hearing was necessary.

In *Montes*, *supra*, 58 Cal.4th at page 833, the prosecutor objected to the trial court considering the defendant's declarations submitted under seal in support of his motion to sever his trial from all other codefendants. The defendant argued the court should review the declarations in camera. After a hearing on the issue, the trial court sustained the prosecutor's objection to the sealed declarations. It reasoned that "the People's due process rights were implicated in the severance motions, and that, if it were to consider the sealed declarations in camera, the People would have no effective way of representing their substantial interest in the determination of the motions." (*Ibid.*)

On appeal, the defendant in *Montes* argued that the trial court erred in failing to fulfill its obligation to consider all available evidence relevant to the severance motions. The *Montes* court disagreed, holding that the trial court properly denied severance on the ground the court had sufficient information to make an informed ruling without considering defendant's sealed declarations. (*Montes*, *supra*, 58 Cal.4th at p. 834.) The *Montes* court explained: "In the absence of any law requiring a trial court to accept an in camera offer of proof for a severance motion, we conclude the trial court's decision to permit or not permit such an offer is within the trial court's discretion. [Citation.] We have found no abuse of discretion in the trial court's ruling in this case. Defendant's claim that the trial court was unable to make an informed ruling on the merits of his motions without considering the sealed declarations is belied by the record. At the

21

hearing on the motions, defense counsel discussed the relevant information raised in the sealed declarations." (*Ibid*.)

Defendant argues that in the instant case he could not make the requisite showing without an in camera hearing. He asserts that, if he had revealed in open court the information supporting severance, the prosecutor would have gained an unfair advantage that would have been devastating to his defense. Defendant further asserts the trial court had no valid basis for assuming it had sufficient information to rule on the motion to sever without holding an in camera hearing. But, as the moving party on severance, it was defendant's burden to present sufficient information to demonstrate that an in camera hearing was necessary to establish severance should be granted. Defendant failed to do so. Merely providing a general statement that defendant might testify in one case and not in the other was insufficient to require the trial court to hold an in camera hearing, outside the presence of the prosecution. The record shows that the trial court was able to make an informed ruling on the motion to sever, and defendant did not demonstrate the need or justification for holding an in camera hearing excluding the prosecutor from the hearing.

Defendant cites *Taylor v. Singletary* (11th Cir. 1997) 122 F.3d 1390, for the proposition the trial court erred in denying his request for an in camera hearing. The court in *Taylor* held that denying the defendant's request to be tried after the co-defendant deprived the defendant of exculpatory testimony by a material witness, in violation of his right to present a defense and to a fair trial. (*Id*. at pp. 1391, 1395.) *Taylor* is distinguishable. In *Taylor* the court granted severance but denied the

defendant's request to have his case tried after the co-defendant's case. (*Id*. at p. 1392.)
The instant case does not involve a codefendant refusing to testify on fifth amendment
grounds, resulting in depriving the defendant of exculpatory testimony. Even though the
case was not severed, defendant was not prevented from testifying on his own behalf.
Defendant also did not demonstrate he would have actually testified in one of the two
cases had the court severed the charges. In addition, there was no showing that his
decision not to testify in the consolidated trial was prejudicial. Furthermore, the court in
*Taylor* did not hold that foregoing an in camera hearing was error. Therefore,
defendant's reliance on *Taylor* is misplaced, and we conclude the trial court did not abuse
its discretion in not holding an in camera hearing.

IV.

INSTRUCTION ON EYEWITNESS IDENTIFICATION

The court instructed the jury with CALCRIM No. 315, which told the jury to
consider 15 factors when evaluating a witness's accuracy in identifying the defendant.
One of the factors stated in the instruction was: "How certain was the witness when he or
she made an identification?" Defendant argues that this identification certainty factor
unfairly tipped the scales in favor of the jury finding A.E.'s identification of defendant
was accurate, thus inculpating defendant and lowering the prosecution's burden of proof,
in violation of defendant's due process rights.

Shortly before oral argument the California Supreme Court decided *People v.
Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*). In *Lemcke*, our high court rejected the

23

defendant's due process challenge to the certainty factor in CALCRIM No. 315. (*Id*. at p. 646.) *Lemcke* held that, because the identification certainty factor is one of 15 factors the jury was told to consider when evaluating identification testimony, the instruction "did not render [the defendant's] trial fundamentally unfair or otherwise amount to a due process violation." (*Id*. at p. 661.)

The court in *Lemcke* acknowledged that, "Contrary to widespread lay belief, there is now near unanimity in the empirical research that 'eyewitness confidence is generally an unreliable indicator of accuracy.' [Citations.]" (*Lemcke*, *supra*, 11 Cal.5th at p. 647.) *Lemcke* further stated that, "[a]s currently worded, CALCRIM No. 315 does nothing to disabuse jurors of that common misconception, but rather tends to reinforce it by implying that an identification is more likely to be reliable when the witness has expressed certainty." (*Id.* at p. 647.) Despite holding there was no due process violation, the *Lemcke* court found that reevaluation of the certainty instruction was warranted and directed trial courts to omit this factor from CALCRIM No. 315 pending further clarification from the Judicial Council and its Advisory Committee on Criminal Jury Instructions. (*Id*. at p. 669.)

During oral argument, defense counsel argued that *Lemcke* is factually distinguishable and therefore not controlling. Defense counsel asserted that in *Lemcke*, the issue of identification certainty was only a minimal part of the case whereas the instant case turned entirely on the victim's certitude that he accurately identified defendant. While we recognize *Lemcke* is factually distinguishable, we disagree that *Lemcke* is not controlling here.

24

As in *Lemcke*, the trial court's instruction did not deny defendant the opportunity to challenge the accuracy of A.E.'s identification of defendant, but merely advised the jury that certainty was one of many factors to be considered in evaluating identification testimony. (*Lemcke*, *supra*, 11 Cal.5th at p. 657; *People v. Sánchez* (2016) 63 Cal.4th 411, 462.) CALCRIM No. 315 also explicitly advised the jury that the prosecution had the burden of proving the perpetrator's identity beyond a reasonable doubt. (CALCRIM No. 315 ["The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty"].) When considered "'in the context of the instructions as a whole and the trial record'" (*People v. Foster* (2010) 50 Cal.4th 1301, 1335), we conclude that including the identification certainty factor as one of 15 factors the jury should consider when evaluating an eyewitness identification did not render defendant's trial fundamentally unfair or otherwise amount to a due process violation. (*Lemcke*, *supra*, at p. 661.)

Even if the trial court erred in giving the identification instruction, there was no prejudicial error. The defense was founded on an alibi, not the accuracy of A.E.'s identification of defendant, and there was substantial evidence tying defendant to the charged crimes, including A.E.'s testimony he was certain defendant robbed him; A.E.'s testimony the person who robbed him at home was the same person that exchanged money with him at the gas station; testimony by the gas station clerk, M.M., who stated she noticed defendant had a chin tattoo of two bars and three dots, signifying the number 13; M.M.'s testimony identifying defendant in a photograph; a video from a business on

25

A.E.'s drive home, which showed A.E's truck and a silver sedan that looked like the same car in the gas station video screenshot; A.E.'s testimony he saw the silver sedan arrive at his home and defendant pulled out a gun and told A.E., "Give me your wallet"; and during a police photo lineup, A.E. identified defendant's photo as the person who robbed him.

We conclude the identification certainty factor did not result in prejudicial error or violate defendant's due process rights. (*Lemcke*, *supra*, 11 Cal.5th at p. 669 [defendant failed to establish that the certainty factor "violated his due process rights or otherwise constituted error under the circumstances" of the trial as a whole]; *People v. Sánchez*, *supra*, 63 Cal.4th at p. 462 [discerning no prejudice to the defendant in light of the overall strength of the evidence and because the instruction did not equate certainty with accuracy]; *People v. Wright* (1988) 45 Cal.3d 1126, 1144-1145 [any error in failing to give the instruction requested by the defense on eyewitness factors was harmless in light of the overall strength of the evidence].)

V.

ADMISSIBILITY OF JAIL "KITE" EVIDENCE

Defendant contends the trial court abused its discretion by allowing evidence of a jail "kite." Defendant argues the kite was inadmissible hearsay evidence and inadmissible under Evidence Code section 352, as more prejudicial than probative. The People argue the kite evidence was admissible hearsay as a statement showing defendant's criminal conspiracy activities within the jail. The People further argue any

26

error was harmless because the kite was properly relied on by the gang expert to formulate his opinion that defendant was an SSC gang member at the time of the charged offenses.

A. *Background Facts*

The People filed a motion in limine requesting to introduce gang evidence, which included a writing or note referred to as a "kite." During a section 402 hearing to establish foundation for introducing the evidence at trial, Correctional Deputy Gonzalez explained that a kite is a surreptitious message communicated between two inmates, written on a small piece of paper. The kite the People sought to introduce at trial consisted of a roster of jail inmates who were members of a jail inmate group known as the "Sureños." The Sureños consisted of Hispanic inmates, most of whom belonged to various Southern California Hispanic street gangs.

Within the jail, the Sureños committed assaults, extortion, and drug dealing. The chief or leader of the Sureños group at the jail was referred to as the "keyholder." On September 19, 2018, jail correctional officers found the subject kite in the keyholder's jail cell. The kite provided the keyholder with information he could use to pass contraband or initiate an assault in court or at other facilities.

As with others listed on the roster, defendant's name, moniker (Temper), name of his street gang, booking number, and his next court date were stated on the kite roster. The kite also stated at the bottom of the roster, a note that "The homie who is assisting me is Temper."

27

Defendant moved to exclude the kite under Evidence Code section 352 and on the ground it was inadmissible hearsay. The prosecutor argued the kite was relevant and admissible under the conspiracy hearsay exception. The prosecutor added the kite was relevant as gang evidence and would be relied upon by the prosecution's gang expert. Defense counsel argued it had nothing to do with the charges against defendant and merely consisted of a list of Hispanic inmates and their gang affiliations. The trial court ruled the kite was admissible because it was relevant and subject to the conspiracy hearsay exception.

During the trial, supervising Probation Officer Goodwyn testified that in 2013, while on the Hemet gang task force, he had contact with defendant and Ricardo during a traffic stop. Based on Goodwyn's conversation with Ricardo and observation of Ricard's gang-related tattoos, he concluded Ricardo was a member of the SSC gang. Riverside Sheriff's Deputy Rutigliano testified that he also participated in a gang task force, from 2012 to 2016. He was with Goodwyn in 2013, when Ricardo and defendant were pulled over for a traffic stop. Rutigliano interviewed defendant at that time and had multiple other contacts with him as well. Rutigliano testified that he documented defendant as belonging to the SSC gang, Hemet 13, based on defendant associating with Ricardo, defendant's gang-related tattoos, and the area where defendant and Ricardo were stopped.

Correctional Deputy Gonzalez informed the jury as to what a kite was and that the Sureños group was an inmate alliance of Hispanic criminal street gang members. While incarcerated, the Sureños inmates contributed to a majority of the assaults. The

28

prosecution's gang expert, senior investigator for the County of Riverside District Attorney's Office, Hemet Police Officer David Hankins, testified that the kite identified the criminal street gang and neighborhood defendant was from. In addition, the kite information contained a message indicating defendant was the keyholder's "right-hand man," which indicated defendant was a member in good standing of a criminal street gang. Officer Hankins stated that, in his opinion, defendant was a member of the SSC gang at the time of the charged crimes, based on the totality of the evidence, including the kite.

B. *Hearsay*

Hearsay evidence is generally inadmissible unless a hearsay exception applies. (Evid. Code, §§ 1200, 1201.) Hearsay statements by coconspirators may be admitted against a party under the coconspirator hearsay exception "if, at the threshold, the offering party presents 'independent evidence to establish prima facie the existence of . . . [a] conspiracy.' [Citations.] Once independent proof of a conspiracy has been shown, three preliminary facts must be established: '(1) that the declarant was participating in a conspiracy at the time of the declaration; (2) that the declaration was in furtherance of the objective of that conspiracy; and (3) that at the time of the declaration the party against whom the evidence is offered was participating or would later participate in the conspiracy.'" (*People v. Hardy* (1992) 2 Cal.4th 86, 139, quoting *People v. Leach*, 15 Cal.3d 419, 430-431, fn. 10; accord, Evid. Code, § 1223.) We apply the abuse of

discretion stand of review to whether the trial court erred in allowing the kite evidence. (*People v. Sanders* (1995) 11 Cal.4th 475, 516.)

Defendant argues the kite is inadmissible hearsay because he did not write the kite note and there was no evidence he adopted its contents. Furthermore, defendant argues the conspiracy hearsay exception does not apply because there was no corroborating evidence, apart from the kite, of an ongoing conspiracy when the kite statement was made or that defendant was a Sureños member, active in a Sureños conspiracy to commit crimes. Defendant also asserts there was no evidence the conspiracy had any bearing on the charged crimes, which occurred two years before the kite was found.

The People argue there was sufficient corroborating evidence to establish a prima facie case that the Sureños were conspiring to commit crimes within the jail. We agree. Deputy Gonzalez's testimony provided corroborating independent evidence of the conspiracy. Such testimony included his statements that the Sureños consisted of an alliance of Hispanic inmates affiliated with various gangs; the Sureños inmates committed crimes within the jail, including extortion, drug possession and distribution, and assaults; the inmate who sent the kite was in the same housing unit as defendant; the kite was sent to the jail keyholder; defendant's name was on the kite roster of inmates; and kites were used by the Sureños to communicate surreptitiously, in furtherance of committing illegal activities within the jail.

This evidence was sufficient to meet the requisite threshold required for the conspiracy hearsay exception. There was sufficient evidence establishing that "'(1) that

30

the declarant was participating in a conspiracy at the time of the declaration; (2) that the declaration was in furtherance of the objective of that conspiracy; and (3) that at the time of the declaration the party against whom the evidence is offered [defendant] was participating or would later participate in the conspiracy.'" (*People v. Hardy*, *supra*, 2 Cal.4th at p. 139, quoting *People v. Leach*, *supra*, 15 Cal.3d at pp. 430-431, fn. 10; accord, Evid. Code, § 1223.) Deputy Gonzalez's testimony and the kite established these elements. Defendant's name was on the kite, along with his gang affiliation, the message at the bottom of the kite indicated defendant was closely involved in Sureños activities, as the keyholder's "right-hand man," and the kite was used by the Sureños in furtherance of committing jail crimes.

C. *Kite Admissibility Under Evidence Code Section 352*

Defendant argues that even if the conspiracy hearsay exception applies, the kite evidence was inadmissible under Evidence Code section 352 as unduly prejudicial, with little, if any probative value. Defendant asserts the evidence was not relevant to a disputed issue and was unnecessarily cumulative evidence of his SSC gang membership. Defendant further argues that evidence he may have been a Sureños member was irrelevant because the gang special circumstance allegation against him (§ 186.22) alleged he intentionally killed the victim while an active participant in the SSC gang, not the Sureños. Defendant notes that the Sureños is a jail organization, not a criminal street gang under section 186.22, subd. (f). In addition, defendant argues the kite was found almost two years after the charged crimes and thus did not establish defendant's gang

31

member status at the time of the charged crimes. As to the prejudicial impact of the kite, defendant argues it suggests he was deeply involved with the Sureños, which tended to show he was a hardened criminal, with a propensity to commit violent crimes, and therefore should not be released.

The admissibility of the kite evidence turns on two components: "(1) whether the challenged evidence satisfied the 'relevancy' requirement set forth in Evidence Code section 210, and (2) if the evidence was relevant, whether the trial court abused its discretion under Evidence Code section 352 in finding that the probative value of the [evidence] was not substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice." (*People v. Scheid* (1997) 16 Cal.4th 1, 13.)

"We have recognized that admission of evidence of a criminal defendant's gang membership creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged. [Citations.] As defendant points out, evidence of a defendant's criminal disposition is inadmissible to prove he committed a specific criminal act. (Evid. Code, § 1101.) Moreover, even where gang membership is relevant, because it may have a highly inflammatory impact on the jury, trial courts should carefully scrutinize such evidence before admitting it." (*People v. Williams* (1997) 16 Cal.4th 153, 193.)

The kite was relevant and had probative value in showing that defendant was an SSC gang member. A reasonable inference could be made from the kite evidence that

defendant was an active SSC member at the time he committed the charged murder. Defendant's active SSC membership at the time of the charged murder was, in turn, relevant to establishing his motive for the murder and the special circumstance gang allegation.

Although there was other evidence of defendant's SSC gang membership, the trial court did not abuse its discretion in concluding the probative value of the kite evidence outweighed its prejudicial nature. "Although no bright-line rules exist for determining when evidence is cumulative, we emphasize that the term 'cumulative' indeed has a substantive meaning, and the application of the term must be reasonable and practical." (*People v. Williams* (2009) 170 Cal.App.4th 587, 611.) Here, it was not an abuse of discretion to admit cumulative evidence concerning defendant's gang membership because it was relevant to a key element of his murder charge and special circumstance allegation, and did not constitute excessive gang evidence. (*Ibid.* ["The sheer volume of evidence extended the trial—and the burden on the judicial system and the jurors— beyond reasonable limits, and the endless discussions among the trial court and counsel concerning the admissibility of such evidence amounted to a virtual street brawl."])

Although the probative value of the evidence was minimal because there was other gang evidence, the kite evidence was also minimally prejudicial for the same reason. The trial court therefore did not err in allowing the kite evidence to show defendant was an SSC member.

Furthermore, even if the trial court abused its discretion under Evidence Code section 352 in allowing the kite evidence, the introduction of the kite evidence was harmless error because it was not any more inflammatory than the other evidence introduced during his trial, and was not heavily relied upon, if at all, by either party during closing argument. In addition, there was strong evidence of defendant's guilt. Admission of the kite evidence was therefore harmless error because it is not reasonably probable that the outcome of the trial would have been more favorable to defendant had the kite evidence been excluded. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

VI.

CALCRIM No. 418

Defendant contends the trial court erred in failing to give the coconspirator jury instruction, CALCRIM No. 418, instructing the jury to disregard the kite evidence unless they found specified prerequisites to admissibility of the evidence. He argues the instruction was required because the trial court permitted the kite hearsay evidence based on the conspiracy hearsay exception under Evidence Code section 1223. Defendant was not charged with conspiracy and neither party requested any instruction on conspiracy, including CALCRIM No. 418.

CALCRIM No. 418 states that, in deciding whether the People have proved that the defendant committed any of the charged crimes, the jury may not consider any statement made out of court by a coconspirator unless the People have proved by a preponderance of the evidence that: "1. Some evidence other than the statement itself

34

establishes that a conspiracy to commit a crime existed when the statement was made; [¶] 2. [The coconspirator] . . . was . . . a . . . member[] of and participating in the conspiracy when (he/she/they) made the statement; [¶] 3. [The coconspirator] made the statement in order to further the goal of the conspiracy; [¶] AND [¶] 4. The statement was made before or during the time that [the defendant] . . . was . . . participating in the conspiracy."

The CALCRIM No. 418 Bench Notes, entitled "Instructional Duty," state that "[t]he court has a sua sponte duty to instruct on the use of a coconspirator's statement to incriminate a defendant if the statement has been admitted under Evidence Code section 1223. [Citations.] [¶] The court must also give either CALCRIM No. 415, Conspiracy, or CALCRIM No. 416, *Evidence of Uncharged Conspiracy*, with this instruction."

CALCRIM No. 416, entitled, "Evidence of Uncharged Conspiracy," states in part: "The People have presented evidence of a conspiracy. A member of a conspiracy is criminally responsible for the acts or statements of any other member of the conspiracy done to help accomplish the goal of the conspiracy." The instruction further states the elements which must be proven to establish that a defendant was a member of a conspiracy in this case. The "Instructional Duty," Bench Notes for CALCRIM No. 416, state: "The court has a sua sponte duty to give this instruction when the prosecution has not charged the crime of conspiracy but has introduced evidence of a conspiracy to prove liability for other offenses or to introduce hearsay statements of coconspirators."

35

These jury instructions and Bench Notes indicate that normally the court is required sua sponte to provide these conspiracy-related instructions when hearsay evidence is introduced under the conspiracy hearsay exception (Evid. Code, § 1223). In the instant case neither party requested the instructions and the trial court did not give them. Defendant argues the court should have given CALCRIM No. 418, instructing the jurors that they could not consider the kite evidence unless they found the requisite underlying conspiracy elements. Defendant asserts that had the trial court given the jury the instruction, the jury would have found there was insufficient evidence of conspiracy and thus would not have considered the kite evidence. Defendant further concludes that, because the jury considered the kite evidence, the jury drew highly prejudicial inferences about defendant's character. Such inference, defendant argues, included that he was a violent, hardened criminal, who had a propensity to commit violent crimes and thus should be incarcerated, regardless of whether the evidence was sufficient to convict him of robbery and murder.

We conclude that, even assuming CALCRIM No. 418 should have been given, any such error in doing so was harmless error. Giving the coconspirator instruction, CALCRIM No. 418, or other conspiracy instructions likely would have confused the jury because defendant was not charged with conspiracy. It is also probable the conspiracy instruction would not have benefitted defendant because instructing on conspiracy would have drawn the jury's attention to defendant's nefarious activities in jail.

36

Defendant notes in his reply brief that the prosecutor argued during the trial that the kite referred to defendant being part of a conspiracy with the Sureños. But this argument occurred out of the presence of the jury, during the hearing on admissibility of the kite. The prosecutor stated that he had offered to lay a foundation outside the presence of the jury to establish the conspiracy, which would require the gang investigation unit officer to testify about the Sureños's activities within the jail and how the kite furthered such activities. The prosecutor added that he did not think it was necessary to discuss in the jury's presence the Sureños's crimes committed in the jail. The prosecutor said he only wanted to lay a minimal foundation for the conspiracy hearsay exception outside the presence of the jury. This was done during an Evidence Code section 402 hearing, during which the trial court ruled the kite evidence was admissible under the conspiracy hearsay exception.

The record shows that any prejudicial impact of the kite evidence was minimized by not instructing on conspiracy or giving CALCRIM No. 418, and by the prosecution not focusing on the kite evidence or related conspiracy during closing argument. We conclude it was not reasonably probable the trial outcome would have been more favorable to defendant had CALCRIM No. 418 been given. Therefore, any error in not giving CALCRIM No. 418 was harmless error. (*People v. Prieto* (2003) 30 Cal.4th 226, 249, 251-252; *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

## VII.

## CUMULATIVE ERROR

37

Defendant contends that the errors raised in his appellate opening brief, discussed above, amount to cumulative prejudicial error. Issues 1 and 2 (section III of this opinion) concern consolidation and severance of the robbery and murder cases, and denial of an in camera hearing on defendant's motion to sever. Issue 3 (section IV of this opinion) concern whether the eyewitness identification instruction was proper. Issues 4 and 5 concern the admissibility of the kite evidence and instruction on conspiracy and admissibility of the kite evidence (sections V and VI of this opinion). Defendant argues that even if these asserted errors were not, standing alone, sufficient to require reversal of defendant's conviction, their cumulative impact requires reversal. We disagree.

"In theory, the aggregate prejudice from several different errors occurring at trial could require reversal even if no single error was prejudicial by itself." (*In re Reno* (2012) 55 Cal.4th 428, 483.) Here, we did not find multiple prejudicial errors. (*People v. Williams* (2013) 56 Cal.4th 165, 201.) There was no error as to issues 1 through 4. As to issue 5, we concluded that, regardless of whether there was error in not instructing the jury on admissibility of the kite evidence and conspiracy, such error was harmless and may have even benefited defendant. "We have either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial." (*People v. Sapp* (2003) 31 Cal.4th 240, 316.) We thus reject defendant's cumulative error contention, there being no cumulative prejudicial error supporting reversal. Defendant has had a fair trial and no miscarriage of justice has resulted. (*Pinter-Brown v. Regents of University of California* (2020) 48 Cal.App.5th 55, 100.)

38

## VIII.

### INSTRUCTION ON DEFENDANT'S GANG'S PRIMARY ACTIVITIES

Defendant contends the trial court erred in failing to instruct the jury on the elements of the predicate crimes qualifying as primary activities of the SSC gang. Defendant asserts the trial court thus failed to instruct on each element of the gang special circumstance.

The jury found true the gang special circumstance (§ 190.2, subd. (a)(22)), which authorizes a defendant to be sentenced to "death or imprisonment in the state prison for life without the possibility of parole" if "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of [s]ection 186.22, and the murder was carried out to further the activities of the criminal street gang."  (§ 190.2, subd. (a)(22).)

Subdivision (f) of section 186.22, defines a "criminal street gang" as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity."

The trial court instructed the jury on the special circumstance gang allegation (§ 190.2, subd. (a)(22)) by giving CALCRIM No. 736, which provides in relevant part:

39

"To prove that this special circumstance is true, the People must prove that:  [¶]  1. The defendant intentionally killed Jesus Garcia;  [¶]  2. At the time of the killing, the defendant was an active participant in a criminal street gang;  [¶]  3. The defendant knew that members of the gang engage in or have engaged in a pattern of criminal gang activity*; and  [¶]  4. The murder was carried out to further the activities of the criminal street gang"  (Italics added.)

The instruction defined "a criminal street gang," consistent with the definition in section 186.22, subdivision (f), as "any ongoing organization, association, or group of three or more persons, whether formal or informal.  [¶]  1. That has a common name or common identifying sign or symbol;  [¶]  2. That has, as one or more of *its primary activities, the commission of assault with a deadly weapon or by means of force likely to produce great bodily injury, as defined in section 245 of the Penal Code, or theft and unlawful taking or driving of a vehicle as defined in section 10851 of the Vehicle Code*; and  [¶]  3. Whose members, whether acting alone or together, engage in or have engaged in a pattern of . . . criminal gang activity."  (Italics added.)

In addition, the trial court instructed that, "[i]n order to qualify as a primary activity, the crime must be one of the group's chief or principal activities rather than an occasional act committed by one or more persons who happen to be members of the group.  [¶]  *A pattern of criminal gang activity*, as used here, means:  [¶]  1. The commission of, or attempted commission of, or conviction of any combination of two or more occurrences of one or more of the following crimes:  *Robbery in violation of Penal*

*Code section 211; criminal threats in violation of Penal Code section 422; homicide in violation of Penal Code section 187; witness intimidation in violation of Penal Code section 136.1, or felon in possession of a firearm in violation of Penal Code section 29800*; [¶] 2. At least one of these crimes was committed after September 26th, 1988; [¶] 3. The most recent crime occurred within three years of one of the earlier crimes; and [¶] 4. The crimes were committed on separate occasions or by two or more persons. [¶] The crimes, if any, that establish a pattern of criminal gang activity need not be gang related. [¶] If you find the defendant guilty of a crime in this case, you may consider that crime in deciding whether one of the group's primary activities was commission of that crime and whether a pattern of criminal gang activity has been proved." (Italics added.)

"A trial court has a sua sponte duty to instruct the jury on the essential elements of a special circumstance allegation." (*People v. Mil* (2012) 53 Cal.4th 400, 409.) "[I]t is well settled that no objection is required to preserve a claim for appellate review that the jury instructions omitted an essential element of the charge." (*Ibid*.) "Against a claim of this kind, which involves the determination of applicable legal principles, an appellate court reviews a trial court's instruction independently." (*People v. Alvarez* (1996) 14 Cal.4th 155, 220.)

A. *Forfeiture*

The People argue defendant forfeited his objection to the instruction by not objecting to the gang special circumstance instruction or requesting the trial court to instruct on the elements of the primary activity crimes (predicate crimes). We agree. "If

41

defendant believed the instructions were incomplete or needed elaboration, it was his obligation to request additional or clarifying instructions. [Citation.] His failure to do so waives the claim in this court. [Citation.]" (*People v. Dennis* (1998) 17 Cal.4th 468, 514; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1189.)

Here, the court instructed the jury on the elements of the gang special circumstance (CALCRIM No. 736), including the primary activities element. Defendant did not object to the instruction or request the trial court to instruct on the elements of the underlying predicate crimes. Because CALCRIM No. 736 was an accurate statement of the law and defendant did not request amplification by stating the elements of the predicate crimes, defendant forfeited his objection to the instruction. (*People v. Palmer* (2005) 133 Cal.App.4th 1141, 1156; *People v. Guiuan* (1998) 18 Cal.4th 558, 570; *People v. Spurlock* (2003) 114 Cal.App.4th 1122, 1130; *People v. Alvarez*, *supra*, 14 Cal.4th at p. 220 ["Because defendant did not request amplification of the otherwise adequate instructions below, he may not complain here."])

B. *Sua Sponte Duty to Instruct on Predicate Crime Elements*

Defendant contends that the trial court had a sua sponte duty to instruct on the gang's predicate crimes. Defendant argues that the Bench Notes on instructional duty for CALCRIM Nos. 1400 and 1401, which instruct on finding a section 186.22 gang crime (subdivision (a)) and gang enhancement (subdivision (b)), state that the trial court must instruct on the elements of the underlying predicate gang crimes. The Bench Notes state: "The court *should* also give the appropriate instructions defining the elements of crimes

42

inserted in the list of alleged 'primary activities,' or the definition of 'pattern of criminal gang activity' that have not been established by prior convictions or sustained juvenile petitions." (Italics added.) We note that, unlike other Bench Notes for CALCRIM Nos. 1400 and 1401, the Bench Notes regarding instructing on the elements of the predicate acts do not state that the trial court *must* instruct on the predicate act elements or that such instructions must be given sua sponte.

While the trial court normally "should" do so, as advised in the Bench Notes, the trial court did not have a sua sponte duty to provide such instruction. The case law defendant cites[4] for the proposition the court had a sua sponte duty to instruct on the predicate crime elements when instructing on the gang special circumstance is inapposite. The cited cases concern instructing on the elements of target offenses of conspiracy and felony murder. Those cases are not on point. They do not address instructing on the gang special circumstance, where the court properly instructed on all of the elements of the gang special circumstance but did not provide additional instruction on the elements of the underlying gang predicate crimes.

C. *Harmless Error*

Even if the trial court erred in not sua sponte instructing on the elements of the predicate crimes constituting SSC's "primary activities," such deficiency was harmless error under both *Chapman* and *Watson*, because there was unrefuted evidence of crimes

---

[4] *People v. Prettyman* 1996) 14 Cal.4th 248, 266; *People v. Cook* (2001) 91 Cal.App.4th 910, 918; *People v. Earnest* (1975) 53 Cal.App.3d 734, 745; *People v. Cain* (1995) 10 Cal.4th 1, 36; *People v. Hughes* (2002) 27 Cal.4th 287, 348-349.

qualifying as "primary activities." (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson*, *supra*, 46 Cal.2d at p. 836.) Those crimes include past and present crimes enumerated in section 186.22, subdivision (e), including defendant's charged crimes of robbery (§ 211) and murder (§ 187), and the crimes the court identified in its special circumstance instruction of (1) assault with a deadly weapon or by means of force likely to produce great bodily injury (§ 245) and (2) theft and unlawful taking or driving of a vehicle (Veh. Code, §§ 10851, 186.22, subds. (e)(1), (2), (3), & (25)).

The court instructed on the charged crimes of robbery and murder but not on the predicate crimes identified in the special circumstance instruction. However, the prosecution's gang expert, Officer Hankins, provided substantial evidence sufficient to establish beyond a reasonable doubt the primary activities element of the special circumstance gang allegation. The prosecution introduced testimony and records establishing convictions of SSC gang members, which included robbery, murder, criminal threats, felon in possession of a firearm, and witness intimidation. Officer Hankins testified he was very familiar with the SSC gang as a result of working for many years in the SSC gang's territory, investigating crimes committed by SSC gang members, and speaking to SSC members. He also testified he had extensive training and experience as a gang expert and had spent 12 years working on the county gang task force, primarily in Hemet, during which he became familiar with the SSC gang.

Officer Hankins testified about the primary activities of the SSC gang, specifying criminal activities that constituted the gang's primary activities. Officer Hankins testified

44

that at the time of defendant's charged offenses, the SSC gang had many primary activities, which included "[m]ost notably narcotic sales, stealing vehicles, violent assaults, felony weapons possessions." Officer Hankins stated that the violent assaults included assaults with a deadly weapon in violation of section 245, and the vehicle thefts included vehicle thefts in violation of Vehicle Code section 10851. Officer Hankins testified he based his opinion regarding the gang's primary activities on the type of crimes he had investigated on a weekly basis and also on a roster on the county court website, which had a list of SSC gang members and the types of crimes for which they were arrested and or convicted.

Officer Hankins further testified that several SSC gang members had been convicted of numerous crimes qualifying as predicate activities under section 186.22, subdivision (e), including gang member Richard, who committed three robberies, with a weapons allegation, and a criminal threats offense (§ 186.22, subd. (e)(2), (24)); Albert, who committed murder, attempt000ed murder, and dissuasion of a witness to benefit the gang (§ 186.22, subds. (e)(3), (8), (24)); and Ricardo, who committed murder (§ 186.22, subds. (e)(8), (31)). In addition, Officer Hankins provided evidence that defendant was involved in drug trafficking, which Officer Hankins testified was one of the gang's primary criminal activities (§ 186.22, subds. (e) (1), (2), (3), (4), & (31)). Officer Hankins also testified that defendant's gang's primary activities included vehicle theft and violent assaults, including with deadly weapons (§ 186.22, subds. (e) (1) and (25)).

45

Our high court's harmless error discussion in *People v. Sengpadychith* (2001) 26 Cal.4th 316 (*Sengpadychith*), is instructive here even though *Sengpadychith* involved a section 186.22, subdivision (b) gang enhancement, rather than a gang special circumstance. The language in the gang special circumstance statute, section 190.2, subdivision (a)(22), parallels the language in section 186.22, subdivision (b)(1) regarding the primary activity element. (*People v. Arce* (2020) 47 Cal.App.5th 700, 713.)

In *Sengpadychith*, the court discussed the definition of "primary activities" and what evidence was sufficient to establish the "primary activities" of a gang, within the meaning of section 186.22, subdivision (f). The *Sengpadychith* court explained that "[s]ufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute. *Also sufficient might be expert testimony*, as occurred in *Gardeley*, *supra*, 14 Cal.4th 605. There, a police gang expert testified that the gang of which defendant Gardeley had for nine years been a member was primarily engaged in the sale of narcotics and witness intimidation, both statutorily enumerated felonies. (See § 186.22, subd. (e)(4) & (8).) The gang expert based his opinion on conversations he had with Gardeley and fellow gang members, and on 'his personal investigations of hundreds of crimes committed by gang members,' together with information from colleagues in his own police department and other law enforcement agencies. (*Gardeley*, *supra*, at p. 620.)" (*Sengpadychith*, *supra*, 26 Cal.4th at p. 324; see also, *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1330.)

In *Martinez,* the court similarly concluded the gang expert's testimony was sufficient to establish the primary activities element. The *Martinez* defendant argued that the expert's testimony did not suffice to prove the gang's primary activities fell within the statute or that gang members had engaged in a pattern of criminal activity. The *Martinez* court disagreed. (*People v. Martinez*, *supra*, 158 Cal.App.4th at p. 1330.) The *Martinez* court concluded the gang expert's testimony was sufficient to establish the primary activities element because the expert specifically testified about the primary activities of the gang and directly testified that specified types of criminal activities constituted the gang's primary activities. The expert also testified that he had both training and experience as a gang expert and had spent eight years dealing with the gang, including investigations and personal conversations with members, and reviews of reports. The *Martinez* court held that such testimony provided adequate foundation for the expert's opinion on the gang's primary activities. (*Ibid*.)

Under *Sengpadychith* and *Martinez*, Officer Hankins's testimony was more than sufficient to establish the primary activities element. (See also *People v. Nguyen* (2015) 61 Cal.4th 1015, 1068; *People v. Prunty* (2015) 62 Cal.4th 59, 82; *People v. Vy* (2004) 122 Cal.App.4th 1209, 1226.) Officer Hankins's expert testimony and related supporting documents regarding the SSC gang's primary activities provided substantial evidence establishing defendant's gang's predicate crimes. Therefore, we conclude that under either the *Chapman* or *Watson* harmless error standard, any error in not providing instruction on the elements of the predicate crimes was harmless. (*Chapman v.*

47

*California*, *supra*, 386 U.S. at p. 24; *People v. Watson*, *supra*, 46 Cal.2d at p. 836; *People v. Mil*, *supra*, 53 Cal.4th at pp. 409-410.)

IX.

SUFFICIENCY OF EVIDENCE OF GANG SPECIAL CIRCUMSTANCE

Defendant contends there was insufficient evidence to support the gang special circumstance. He argues that the gang expert's testimony was insufficient to establish that the gang's chief or principal activities included the predicate crimes of (1) assault with a deadly weapon or by means of force likely to produce great bodily injury (§ 245) and (2) theft and unlawful taking or driving of a vehicle (§ 10851).

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence . . . . The same standard of review applies to the sufficiency of the evidence supporting special circumstance findings." (*People v. Edwards* (2013) 57 Cal.4th 658, 715; accord, *People v. Dalton* (2019) 7 Cal.5th 166, 243-244.)

As defendant asserted regarding the trial court's prejudicial error in failing to instruct on the elements of SSC's predicate crimes, defendant argues evidence of the two predicate crimes specified in the gang special circumstance instruction was insufficient. As to the vehicle theft crime (§ 10851), defendant argues the gang expert may have relied on car thefts which did not qualify as a predicate crime because the stolen car did not have a value of at least $950. Defendant's contention is based on speculation. Defendant

48

has not cited any evidence supporting this argument. The gang expert's testimony that the SSC gang's vehicle theft crimes qualified as predicate crimes was sufficient to support the primary activities element of the gang special circumstance. (*Sengpadychith*, *supra*, 26 Cal.4th at p. 324; *People v. Martinez*, *supra*, 158 Cal.App.4th at p. 1330.)

Defendant further asserts there was insufficient evidence of the other listed predicate crime, assault with a deadly weapon or by means of force likely to produce great bodily injury (§ 245). Defendant argues that not all violent assaults qualify as primary activities under section 186.22, subdivision (e). Only assaults with a deadly weapon or by means likely to cause great bodily injury qualify (§ 186.22, subd. (e)(1)). Defendant asserts that Officer Hankins did not specify that, when he stated SSC's primary activities included "violent assaults," he was only referring to violent assaults qualifying under section 186.22, subdivision (e)(1). But there was no evidence Officer Hankins was relying on violent assault crimes that did not qualify as a predicate crime.

We therefore conclude there was substantial evidence to support the gang special circumstance. Such evidence includes gang expert Officer Hankins's testimony regarding the SCC gang and related supporting documents. Officer Hankins testified that the SSC gang had many primary activities, which included "[m]ost notably narcotic sales, stealing vehicles, violent assaults, felony weapons possessions." Officer Hankins further stated that the violent assaults included assaults with a deadly weapon in violation of section 245, and the auto thefts included vehicle thefts in violation of Vehicle Code section 10851. Most, if not all, of the crimes Officer Hankins listed as SSC primary

49

activities, qualify as predicate crimes enumerated in section 186.22, subdivision (e). The gang expert's testimony, supporting documents, and evidence of the charged crimes provided substantial evidence of each element of the gang special circumstance, including the primary activities element. (*People v. Sengpadychith*, *supra*, 26 Cal.4th at p. 324; *People v. Martinez*, *supra*, 158 Cal.App.4th at p. 1330; *People v. Nguyen*, *supra*, 61 Cal.4th at p. 1068; *People v. Prunty*, *supra*, 62 Cal.4th at p. 82; *People v. Vy*, *supra*, 122 Cal.App.4th at p. 1226.)

## X.

## SUFFICIENCY OF EVIDENCE OF WITNESS-KILLING MURDER

## SPECIAL CIRCUMSTANCE

Defendant contends there was insufficient evidence to support the witness-killing special circumstance (§ 190.2, subdivision (a)(10)). We disagree.

The witness-killing special circumstance is stated in subdivision (a)(10) of section 190.2, as follows: "The victim was *a witness to a crime who was intentionally killed for the purpose of preventing his or her testimony* in any criminal or juvenile proceeding, and the killing was not committed during the commission or attempted commission, of the crime to which he or she was a witness; *or the victim was a witness to a crime and was intentionally killed in retaliation for his or her testimony in any criminal or juvenile proceeding*." (Italics added.)

The trial court instructed the jury on the witness-killing special circumstance by giving CALCRIM No. 725, as follows: "The defendant is charged with the special

50

circumstance, murder of a witness in violation of Penal Code section 190.2, sub (a), sub (10). To prove that this special circumstance is true, the People must prove that: [¶] 1. The defendant intended to kill Jesus Garcia; [¶] 2. Jesus Garcia was a witness to a crime; [¶] 3. The killing was not committed during the commission or attempted commission of the crime to which Jesus Garcia was a witness; and [¶] 4. The [defendant] intended that Jesus Garcia be killed to prevent him from testifying in a criminal proceeding."

"If the defendant intentionally kills a would-be witness for the purpose of preventing the victim from testifying in a criminal proceeding, it is not a defense to the special circumstance allegation that he had another purpose as well." (*People v. Stanley* (1995) 10 Cal.4th 764, 801; *People v. Sanders*, *supra*, 51 Cal.3d at p. 519.)

Defendant contends that Jesus was not a key witness in Albert and Ricardo's trial. We disagree. As noted in the CALCRIM No. 725 comments and cited caselaw, "It is no defense to the special circumstance allegation that the victim was not an important witness in the criminal proceeding, so long as one of the defendant's purposes was to prevent the witness from testifying." (*People v. Jenkins* (2000) 22 Cal.4th 900, 1018; see also *People v. Bolter* (2001) 90 Cal.App.4th 240, 242-243 [special circumstance applied to retaliation for testifying where witness's actual testimony was innocuous].)

Defendant argues there was no evidence he knew Jesus was going to testify in the trial or believed that Jesus needed to be prevented from doing so to prevent convictions against Albert and Ricardo. In addition, defendant asserts that there was no evidence

anyone told defendant to kill Jesus or that defendant decided to kill Jesus because defendant anticipated Jesus would provide important testimony in Albert and Ricardo's upcoming trial.  However, a reasonable inference could be made from the evidence that defendant found out that Jesus had provided law enforcement with information linking Albert and Ricardo to the murder of John Moreno.  Most likely, defendant was informed that Jesus was a police informant after Investigator Purcell testified at Albert and Ricardo's preliminary hearing in October 2016.  It could be reasonably inferred that Albert Ricardo, or other gang members informed defendant of Investigator Purcell's testimony and that Jesus was a police informant.[5]  The jury could also reasonably infer that, after becoming aware of this, defendant killed Jesus to prevent Jesus from testifying, because defendant believed Jesus would be an adverse witness in Albert and Ricardo's future trial.  (*People v. Jenkins*, *supra*, 22 Cal.4th at p. 1018; *People v. Weidert* (1985) 39 Cal.3d 836, 853; *People v. Sanders*, *supra*, 51 Cal.3d at p. 518.)

Substantial evidence supporting the witness-killing special circumstance against defendant included J.C.'s testimony that defendant told him "there was paperwork on the person that he had shot."  It could be reasonably inferred from this statement that defendant killed Jesus because defendant had been told Jesus had provided the police with information implicating Albert and Ricardo in John Moreno's murder.  J.C. testified

---

[5]  Defendant states in his appellate reply brief:  "The fact that Jesus was ultimately not an important witness is significant circumstantial evidence that *Frenes, who as a member of the gang and close friend of [Ricardo] was likely familiar with the state of the inculpatory evidence . . . .*"  (Italics added.)

that defendant had told him Jesus "was a police informant." In addition, Officer Hankins testified that he believed defendant killed Jesus to prevent him from testifying and in retaliation for Jesus's statement to the police against a gang member.

Defendant argues there was no evidence supporting Officer Hankins's conclusion that defendant killed Jesus to prevent him from testifying. We disagree. Even though there was evidence supporting a finding that retribution may have been a motive for Jesus's murder, the same evidence also supported a reasonable inference that defendant killed Jesus to prevent him from testifying at Albert and Ricardo's upcoming trial. We thus conclude there was substantial evidence to support the witness-killing special circumstance against defendant.

## XI.

## ABSTRACT OF JUDGMENT ERROR

Defendant asserts that the abstract of judgment for defendant's determinate and indeterminate sentencing should be corrected to state that defendant's trial was a jury trial not a court trial. The People agree, as do we. The abstract of judgment should be corrected to reflect that defendant's trial was a jury trial. (*People v. High* (2004) 119 Cal.App.4th 1192, 1200 [the appellate may "direct the trial court to correct the cited clerical errors"].)

## XII.

## PRISON PRIOR SENTENCING ERROR

Defendant requests this court to strike his count 2, prison prior enhancement under Senate Bill No. 136, which amends section 667.5, subdivision (b). The People agree, as does this court, that defendant's one-year prison prior enhancement must be stricken.

Senate Bill No. 136 was passed into law in October 2019, and became effective January 1, 2020. (Sen. Bill No. 136; Cal. Const., art. IV, § 8, subd. (c)(2).) Senate Bill No. 136 amended section 667.5, subdivision (b), so as to eliminate all prior prison term enhancements unless the prior prison term is for a sexually violent felony as defined in Welfare and Institutions Code section 6600, subdivision (b). It is undisputed that defendant's prison prior conviction was not for a sexually violent offense. His 2013 prison prior conviction was for violating section 245, subdivision (a) (assault by force likely to cause great bodily injury).

Accordingly, under section 667.5, subdivision (b), as amended, defendant's prison prior does not qualify as a prison prior enhancement.

As ameliorative legislation, Senate Bill No. 136 applies to all defendants whose convictions were not final when the legislation took effect on January 1, 2020. (*People v. Cruz* (2020) 46 Cal.App.5th 715, 738-739; *People v. Lopez* (2019) 42 Cal.App.5th 337, 341-342; see generally *People v. Brown* (2012) 54 Cal.4th 314, 323.) Defendant's conviction was not final as of January 1, 2020, the effective date of section 667.5, subdivision (b), as amended. (See *People v. Vieira* (2005) 35 Cal.4th 264, 306.) Because

54

defendant's conviction is not yet final, and because section 667.5, subdivision (b), as amended, leads to a reduced sentence, the amendment to section 667.5, subdivision (b), applies retroactively to defendant's prison prior. (See *People v. Garcia* (2018) 28 Cal.App.5th 961, 972; see also *In re Estrada* (1965) 63 Cal.2d 740, 745.)

Both parties agree this court should strike the one-year prison prior and remand this matter for resentencing. Although it is unlikely the trial court will change defendant's sentence upon remand, after striking defendant's one-year prison prior enhancement, this matter should be remanded to allow the trial court to exercise its discretion on resentencing defendant. Generally, when part of a sentence is stricken, we must remand for a full resentencing on all counts and allegations. (*People v. Hubbard* (2018) 27 Cal.App.5th 9, 13; *People v. Navarro* (2007) 40 Cal.4th 668, 681; *People v. Buycks* (2018) 5 Cal.5th 857, 893.) Therefore, because we reverse defendant's one-year section 667.5, subdivision (b) prison prior enhancement under the "full resentencing rule," we remand the matter for resentencing to allow the court to exercise its sentencing discretion in light of the changed circumstances. (*People v. Buycks*, *supra*, at p. 893; *People v. Jennings* (2019) 42 Cal.App.5th 664, 682.) We take no position on how the court should exercise its discretion on remand.

XIII.

DISPOSITION

Defendant's prison prior enhancement (§ 667.5, subdivision (b)) is ordered stricken and the matter is remanded for resentencing. In all other respects, the judgment

55

is affirmed.  The trial court is directed to correct the abstract of judgment to state that defendant's convictions were by a jury trial, not a court trial.

After resentencing defendant on remand, the trial court shall issue an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


CODRINGTON
Acting P. J.

We concur:


SLOUGH
J.


RAPHAEL
J.